## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GREGORY MCMILLEN

    Plaintiff,

      v.

GHALIAH OBAISI, as Independent
Executor of the Estate of SALEH
OBAISI; DR. ROZEL ELAZEGUI; and
WEXFORD HEALTH SOURCES, INC.

    Defendants.

No. 17-cv-00999

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory McMillen ("McMillen"), an inmate at Stateville Correctional Center ("Stateville"), filed this action under 42 U.S.C. § 1983 against Defendants Wexford Health Sources, Inc. ("Wexford"); Ghaliah Obaisi, Independent Executor of the Estate of Dr. Saleh Obaisi; and Dr. Rozel Elazegui. Wexford is a medical services vendor providing medical treatment to inmates within the Illinois Department of Corrections, which employed Dr. Saleh Obaisi and Dr. Rozel Elazegui at Stateville. Defendants have moved for summary judgment. (Dkt. 82.)

Although McMillen agrees he received excellent medical care, he nevertheless contends that Defendants were, in violation of the Eighth Amendment, deliberately indifferent to his serious medical conditions by failing to provide treatment on a more timely basis. (Dkt. 120 at 1.) McMillen alleges that Dr. Saleh Obaisi failed to ensure adequate and timely treatment for his diabetic eye disease (Count I); that both Dr.

Obaisi and Dr. Rozel Elazegui ("the Doctors") delayed and failed to secure proper medical treatment for his chest pain and shortness of breath (Count II); and that Wexford carries out cost-saving policies that resulted in McMillen receiving substandard treatment for his medical needs (Count III). (Dkt. 20.) In seeking summary judgment, Defendants argue that McMillen has produced no verifying medical evidence criticizing the Doctors' treatment decisions to refute the expert testimony from a cardiologist and an ophthalmologist that the Doctors' timely and adequately treated McMillen for his eye, breathing, and chest conditions. (Dkt. 82.) McMillen counters that the facts establish the elements of deliberate indifference or at least establish a genuine issue of fact for a jury to decide. (Dkt. 120.)

As the undisputed facts show, McMillen received comprehensive care for his medical conditions. And although McMillen complains about the timeliness of his treatment, those assertions are not supported by the evidence developed through a lengthy period of discovery. Because his treatment met the acceptable standards of care, McMillen cannot show that the Doctors acted with a sufficiently culpable state of mind to establish that the Doctors were deliberately indifferent to McMillen's medical conditions in violation of his Eighth Amendment rights. Accordingly, Defendants are entitled to summary judgment on all counts.[1]

---

[1] In his Response to Defendants' motion for summary judgment, McMillen concedes that he cannot meet his burden on Count III. (Dkt. 120 at 11.) Accordingly, Defendants are entitled to summary judgment as to Count III.

## I.    BACKGROUND

As an inmate, McMillen received extensive care for his eye, breathing, and chest issues. (Dkt. 120 ¶ 1.) As the record reflects, the Doctors developed a comprehensive medical treatment plan covering McMillen's eye condition and McMillen's breathing/chest conditions. This plan included treatments with multiple doctors and specialists. (Dkt. 120-1 ¶¶ 10–36, 38–67.) As treatment for his eye condition, McMillen received two focal laser retinal therapies for both eyes and numerous intravitreal injections. (*Id.* ¶ 8.) McMillen treated on numerous occasions with on-site optometrists at Stateville and with offsite specialists, including two of the best retinal specialists in Illinois: Dr. Joseph Civantos at Illinois Retina Associates ("IRA") and Dr. Jennifer Lim at University of Illinois Chicago ("UIC"). (*Id.* ¶¶ 10, 16, 18, 22, 71.)

As treatment for his breathing/chest condition, McMillen was prescribed more than a dozen medications, as well as nebulizer treatments and rescue inhalers. (*Id.* ¶¶ 37–43, 46, 50–52, 56, 63.) McMillen received medical permits and accommodations including a lower bunk, a lower gallery, hearing aids, diabetic shoes, an eye patch, and a front-cuffing allowance. (*Id.* ¶ 45.) McMillen also received a portable defibrillator, a surgically implanted intra-aortic balloon pump, and a biventricular implantable cardioverter defibrillator. (*Id.* ¶¶ 47, 54, 62, 79.) Various doctors ordered nineteen chest and five abdomen x-rays; three CT scans; twenty-three electrocardiograms; two pulmonary function studies by a pulmonologist; three transthoracic echocardiograms; physical and occupational therapy; an exercise test;

and a myocardial perfusion study. (*Id.* ¶¶ 48, 50, 54, 65.) Dr. Alma Martija treated McMillen at Stateville's asthma, diabetes, and cardiac clinics, and McMillen visited numerous offsite cardiologists, pulmonologists, and a neurologist. (*Id.* ¶¶ 47, 48, 51, 54–59, 61–62, 64.)

### A. Timeline of Eye Condition Treatment

On November 18, 2013, at the approval of Dr. Obaisi and Wexford, Dr. Joseph Civantos diagnosed McMillen—a 55-year-old male with a 10-year history of diabetes mellitus—with "nonproliferative diabetic maculopathy with diabetic macular edema." (*Id.* ¶ 11.) McMillen was treated by Dr. Civantos on 16 more occasions— December 12, 2013; January 13, 2014; January 17, 2014; March 16, 2017; June 5, 2017; July 17, 2017; August 28, 2017; October 5, 2017; November 2, 2017; December 4, 2017; January 18, 2018; February 22, 2018; May 3, 2018; June 14, 2018; July 23, 2018; and September 10, 2018—each of which were appointments approved by Dr. Obaisi and Wexford. (*Id.* ¶¶ 12–14, 24–36.) On March 23, 2015, Dr. Jennifer Lim evaluated McMillen at the University of Illinois Ophthalmology Vitreoretinal clinic. (*Id.* ¶ 15.) McMillen was treated by Dr. Lim on five more occasions—April 18, 2016; August 22, 2016; September 19, 2016; November 21, 2016; and February 27, 2017— each of which were appointments approved by Dr. Obaisi and Wexford. (*Id.* ¶¶ 17, 19–21, 23.)

McMillen had various optometrist appointments at Stateville on April 6, 2015; June 15, 2015; September 14, 2015; November 30, 2015; March 29, 2016, June 3, 2016, and November 28, 2016—each of which were appointments approved by Dr.

Obaisi and Wexford. (*Id.* ¶¶ 16, 22). McMillen received two focal laser retinal therapies for both of his eyes and numerous intravitreal injections (*Id.* ¶ 8.) Dr. Obaisi and Dr. Elazegui, both of whom are primary care physicians, provided medical assistance to McMillen on-site by issuing medical permits and ensuring that McMillen was seen by Stateville's optometrists. (*Id.* ¶¶ 10, 16, 18, 22, 45.)

McMillen complains of delays in his treatment. (Dkt. 120 at 3–6.) From April 17, 2014 to March 23, 2015, McMillen's eye condition was not treated by an ophthalmologist. (Dkt. 120-1 ¶¶ 14–15.) McMillen attests that, during this time, he told Dr. Obaisi and other Stateville medical personnel every time he saw them that his eyesight was getting worse, that he needed to see a specialist ophthalmologist, and that he was quite concerned about going blind. (Dkt. 120 at 3; Dkt. 120-2, Ex. 1, ¶¶ 3–5.) During that period, Dr. Alma Martija evaluated McMillen on May 1, 2014, September 5, 2014, and January 28, 2015, to manage his diabetes symptoms, including his vision problems. (Dkt 84-6 at 122–48.) When McMillen saw Dr. Lim on March 23, 2015, she recommended he return in three months. (Dkt. 84-8 at 163.) McMillen did not return to Dr. Lim until April 18, 2016, but he did have five appointments with optometrists at Stateville during that period. (Dkt. 120-1 ¶¶ 15–17.) When McMillen saw Dr. Lim on April 18, 2016, she recommended he return in one month. (Dkt. 84-8 at 160). McMillen returned to Dr. Lim four months later, on August 22, 2016, but he did see an optometrist at Stateville on June 3, 2016. (Dkt. 120-1 ¶¶ 15–17.) When McMillen saw Dr. Lim on August 22, 2016, she again recommended he return in one month; McMillen returned on September 19, 2016,

and again Dr. Lim recommended another follow-up in one month. (Dkt. 120-1 ¶ 20; Dkt. 84-8 at 155, 157). McMillen next saw Dr. Lim two months later, on November 21, 2016, when Dr. Lim again recommended a follow-up in one month. (Dkt. 120-1 ¶ 21; Dkt. 84-8 at 155.) McMillen returned to Dr. Lim more than three months later, on February 27, 2017. (Dkt. 120-1 ¶ 23.) At that appointment, Dr. Lim noted that McMillen's macular edema in his left eye had deteriorated into atrophy and only treated his right eye. (Dkt. 120-1 ¶ 23; Dkt. 126 ¶ 11.)

After filing this case, McMillen was treated by Dr. Civantos, McMillen's previous ophthalmologist, nearly every month from March 16, 2017 and through September 2018. (Dkt. 120-1 ¶¶ 24–36.) McMillen suggests that the Court should infer from his post-filing treatments "that while the Defendants are indifferent to McMillen's serious medical conditions, they are not indifferent to their own liability." (Dkt. 120 at 6.) McMillen ultimately experienced irreversible vision loss in his left eye. (Dkt. 120-1 ¶ 30.) But McMillen offers no expert opinion as to the timeliness or adequacy of his eye treatment.

Defendants' expert, Dr. Walter Jay, Professor Emeritus of Ophthalmology at Loyola University Chicago, opined to a reasonable degree of medical certainty that McMillen's eye treatment met the required standard of care. (*Id.* ¶¶ 69–70.) Dr. Jay opined that, despite McMillen's allegations that there were several purported "delays" in treatment from 2015 until the present, McMillen did not suffer any significant vision loss during this time. (*Id.* ¶ 72.) Dr. Jay opined to a reasonable degree of medical certainty that, to the extent that McMillen's vision changed during

the alleged delays, those changes were likely the result of McMillen's underlying condition, not from a lack of intravitreal injections. (*Id*.) Dr. Jay opined that even when a patient with a diabetic eye disease receives excellent treatment, which McMillen admits he received, vision loss may still occur. (*Id*. ¶ 70.) Dr. Jay opined that, in his medical opinion, Dr. Saleh Obaisi and Dr. Rozel Elazegui—as McMillen's primary care physicians at Stateville—could appropriately refer to and rely on the expertise of retinal specialists as it related to McMillen's "extremely complicated ophthalmological condition." (*Id*. ¶ 75.) Finally, Dr. Jay noted that diabetic macular edema is not associated with a painful eye condition. (*Id*. ¶ 73.)

## B.    Timeline of Breathing/Chest Condition Treatment

On December 22, 2016, Dr. Obaisi treated McMillen, who had reported chest pain, breathing difficulties, and being out of his inhaler, for which he received nebulizer treatments. (Dkt. 84-6 at 56; Dkt. 120-1 ¶¶ 37–45; Dkt. 126 ¶ 12.) On some occasions, McMillen refused the nebulizer treatments he was offered because he believed they were not working and seemed to make his symptoms worse. (Dkt. 126 ¶ 15.) On April 26, 2017, McMillen was hospitalized on an emergency basis for hypertensive heart disease. (Dkt. 120-1 ¶ 47). McMillen received a cardiac catheterization and an intra-aortic balloon pump and was transferred to UIC for two weeks of additional care and monitoring (*Id*.)

On May 4, 2017, Dr. Willoughby and neurologist Dr. Charles Abram found McMillan had pulmonary edema, pneumonia, and elevated liver enzymes, likely due to cardiogenic shock. (*Id*.) On May 6, 2017, McMillen underwent a transthoracic

echocardiogram which indicated that his ejection fraction had increased. (*Id.*) UIC Cardiologist Dr. Benjamin Levin examined McMillen on May 13, 2017, and recommended discharge and physical therapy. (*Id.* ¶ 48.) Dr. Obaisi submitted a referral and report to Wexford the following day. (*Id.*) On July 11, 2017, Dr. Levin adjusted McMillen's medications and administered an Electrocardiogram ("ECG"). (*Id.* ¶ 49.) McMillen suggests that, at the July 11, 2017 appointment, Dr. Levin ordered a follow-up within four months and a consult with a pulmonary doctor, but McMillen's medical records do not reflect this assertion. (Dkt. 126 ¶ 16.) Between July 11, 2017 and August 8, 2017, McMillen attended physical therapy. (*Id.* ¶ 50.) On December 3, 2017, at the direction of Dr. Obaisi and Wexford, McMillen had a chest x-ray completed. (Dkt. 120-1 ¶ 51.)

McMillen's treatment for his breathing and heart conditions continued throughout 2018, even after he filed this case. McMillen returned to Dr. Levin on January 16, 2018. (Dkt. 126 ¶¶ 18–19.) On February 15, 2018 and March 6, 2018, McMillen was treated for shortness of breath, and he was hospitalized on April 1, 2018 due to wheezing and breathing complications, including pneumonia. (Dkt. 120-1 ¶¶ 52–54.) On June 4, 2018, McMillen presented to Dr. Patrick Belvitch and Dr. John Willoughby for a pulmonology consult, at the approval of Wexford. (*Id.* ¶ 55.) On June 26, 2018, McMillen returned to UIC in response to complaints of chest pain. (*Id.* ¶ 56.) On July 26, 2018, McMillen presented to UIC emergency room Dr. Amit Arwindekar for complaints of chest pain and discomfort. (*Id.* ¶ 57.) On October 8, 2018, per the approval of Wexford, McMillen followed up with Dr. Belvitch at UIC's

pulmonology clinic; on October 10, 2018, he saw cardiologist Dr. Pollandt; and on November 21, 2018, McMillen returned to the UIC heart clinic. (*Id.* ¶¶ 58–59.) In early December 2018, McMillen sought oxygen at night to help him sleep and was refusing his blood pressure medication. (*Id.* ¶ 60.) On December 31, 2018, at the approval of Wexford, McMillen presented to his pulmonologist, Dr. Belvitch, at UIC. (*Id.* ¶ 61.)

McMillen's treatment continued into 2019. On January 7, 2019, with Wexford's approval, McMillen presented to cardiologist Dr. Rosalia Gonzalez and agreed to receive surgery for a biventricular implantable cardioverter defibrillator (ICD) to replace his LifeVest. (*Id.* ¶ 62.) On January 11, 2019, McMillen presented to sick call and reported that he was feeling constant chest pain; the doctor noted that McMillen exhibited poor compliance with his medications. (*Id.* ¶ 63.) On February 19, 2019, with Wexford's approval, McMillen presented to cardiologist Dr. Levin. (*Id.* ¶ 64.) McMillen offers no expert opinion as to the timeliness or adequacy of the treatment of his breathing and chest conditions.

Defendants' expert, Dr. Ronald Berger, a licensed medical physician in the State of Illinois and board certified in Cardiology and Internal Medicine, opined that McMillen's treating physicians at Stateville managed his condition appropriately and that a referral to a cardiologist was not medically necessary from 2013 to 2017. (*Id.* ¶¶ 76–77.) Dr. Berger further opined that there was no "delay" in referring McMillen for offsite care, and that none of McMillen's medical conditions were exacerbated or allowed to progress due to not seeing a specialist sooner than he did. (*Id.* ¶ 77.) Dr.

Berger opined that, when McMillen's complaints worsened in 2017, his physicians at Stateville acted promptly and appropriately by referring him to specialists when indicated. (*Id.* ¶ 79.)

## II.    LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to McMillen as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.   DISCUSSION

A prison official violates a prisoner's Eighth Amendment rights when he displays deliberate indifference to a serious medical need. *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). A deliberate indifference claim has two components: a prisoner must have an objectively and sufficiently serious medical condition, and the prison official must have subjectively acted with a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes*, 546 F.3d at 522. The parties do not dispute that McMillen's eye and breathing/chest conditions were objectively serious medical conditions.

Whether an official acted with a sufficiently culpable state of mind requires a plaintiff to make two showings: the official must have subjective knowledge of the risk to the inmate's health and must also disregard that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Negligence, gross negligence, or even tortious recklessness do not satisfy the level of culpability deliberate indifference entails. *Farmer,* 511 U.S. at 837. Accordingly, neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Estate of Cole by*

11

*Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (medical providers' differing opinions as to best treatment for prisoner do not amount to deliberate indifference). Officials must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Greeno*, 414 F.3d at 653 (citing *Farmer*, 511 U.S. at 837). To infer the required culpability for a claim of deliberate indifference based on a medical professional's care, the medical professional's decision-making must be so far afield of accepted professional standards as to raise the inference that the medical professional was not actually making medical judgments. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A plaintiff inmate must show that the defendants' responses to his complaints of severe pain were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

A significant delay in effective medical treatment may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (reversing summary judgment for defendants where plaintiff did not receive treatment for painful broken nose for nearly two days). Without verifying medical evidence of inadequate treatment, however, a prisoner's self-serving opinion about the quality of his medical treatment is insufficient to raise a genuine issue of material fact. *Id.*

A.  **McMillen's Deliberate Indifference Claim as to His Eye Condition**

There is no dispute the McMillen's eye condition was serious. There is also no dispute that McMillen received "excellent care." (Dkt. 120 at 1.) What is disputed is whether the alleged "delays" between McMillen's follow-up appointments were intentional or so plainly inappropriate as to permit the inference that Dr. Obaisi intentionally or recklessly disregarded McMillen's needs. As explained below, the Court holds that no reasonable jury could make that finding. Dr. Obaisi is thus entitled to summary judgment as to Count I.

Dr. Obaisi knew of the risk posed by McMillen's eye condition; it was that risk that prompted Dr. Obaisi to direct Stateville optometrists and two of the best retinal specialists in Illinois to provide McMillen extensive and regular treatment for his eye condition, including two focal laser retinal therapies for both of his eyes and numerous intravitreal injections. (Dkt. 120-1 ¶¶ 8, 10, 16, 18, 22, 71.) From November 2013 to September 2018, with the approval of Dr. Obaisi, McMillen was treated by Dr. Civantos on 17 occasions—once every three to four months. (*Id.* ¶¶ 12–14, 24–36.) From March 2015 to February 2017, with the approval of Dr. Obaisi, McMillen was treated by Dr. Lim on six occasions—once every four months. (*Id.* ¶¶ 15, 17, 19–21, 23.) From April 2015 to November 2016, with the approval of Dr. Obaisi, McMillen was treated by Stateville optometrists on seven occasions—once every two to three months. (*Id.* ¶¶ 16, 22.) Given the regularity of the treatments that Dr. Obaisi ordered, it would be unreasonable to find that Dr. Obaisi disregarded the risk posed by McMillen's eye condition. *Collins,* 462 F.3d at 761. But McMillen insists

13

that the Court infer that purported "delays" in his treatment were intentional or criminally reckless. *Farmer,* 511 U.S. at 837.

McMillen complains he was not treated by an ophthalmologist between April 17, 2014 to March 23, 2015. (Dkt. 120-1 ¶¶ 14–15.) Although McMillen alleges he complained of worsening eyesight and concerns of going blind, he does not allege that he was suffering from any pain at that time, nor does McMillen provide any evidence that his eyesight did, in fact, worsen. (Dkt. 120 at 3; Dkt. 120-2, Ex. 1, ¶¶ 3–5.) This accords with Dr. Jay's opinion that diabetic macular edema is not associated with a painful eye condition. (Dkt. 120-1 ¶ 73.) Moreover, during that period, McMillen was treated by Dr. Alma Martija on three occasions to manage his diabetes symptoms, including his vision problems. (Dkt 84-6 at 122–48.)

McMillen points to several occasions when he did not receive follow-ups with Dr. Lim despite her recommendation. In March 2015, Dr. Lim recommended that McMillen return in three months, but McMillen did not return to Dr. Lim until April 2016, 11 months later. (Dkt. 84-8 at 163). But McMillen had five appointments with optometrists at Stateville during that period, approximately every other month. (Dkt. 120-1 ¶¶ 15–17.) In April 2016, Dr. Lim recommended a follow-up in one month, but McMillen returned four months later. (Dkt. 84-8 at 160). McMillen, however, was treated by a Stateville optometrist during that period. (Dkt. 120-1 ¶¶ 15–17.) In September 2016, Dr. Lim recommended another one-month follow-up, but McMillen returned two months later. (Dkt. 120-1 ¶¶ 20–21; Dkt. 84-8 at 155, 157). In November 2016, Dr. Lim recommended another one-month follow-up, but McMillen returned

more than three months later, in February 2017. (Dkt. 120-1 ¶ 23.) McMillen does not allege that he suffered any pain during these periods or that his condition deteriorated due to a delay in treatment. Indeed, McMillen offers no expert opinion at all as to the timeliness or adequacy of his eye treatment.

Nothing in the record suggests these "delays" were so far afield of accepted professional standards as to raise the inference that any medical professional was not actually making medical judgments. *Forbes* 112 F.3d at 267. McMillen provides no "verifying medical evidence" that the alleged "delays," and not his underlying condition, caused some harm. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Williams v. Leifer*, 491 F.3d 710, 714–15 (7th Cir. 2007). In contrast, Dr. Jay opined that McMillen's eye treatment met the required standard of care; that McMillen did not suffer any significant vision loss during the alleged "delays"; and that to the extent McMillen's vision changed during the alleged "delays," those changes were likely the result of McMillen's underlying condition. (Dkt. 120-1 ¶¶ 69–70, 72.) McMillen also fails to present evidence he suffered prolonged or unnecessary pain during these "delays." *Berry* 604 F.3d at 441. Even in the light most favorable to McMillen, his complaints are, at best, "factual highlights" of isolated incidents of neglect during an otherwise continuous stretch of adequate medical care. Put plainly, this record could not reasonably support an inference of deliberate indifference. *Gutierrez v. Peters*, 111 F.3d 1364, 1374–75 (7th Cir. 1997).

McMillen has failed to establish sufficient evidence that Dr. Obaisi had the requisite culpable state of mind, *i.e.*, that Dr. Obaisi both knew of and disregarded

the risk of harm to McMillen. McMillen's self-serving opinion about the timeliness of his medical treatment is insufficient to raise a genuine issue of material fact, and no reasonable jury could find in his favor on Count I.

### B. McMillen's Deliberate Indifference Claim as to His Chest/Breathing Condition

McMillen agrees that he received excellent, comprehensive treatment for his breathing/chest condition. But McMillen complains of two alleged delays[2] in his treatment for his breathing/chest problems: the four-month period from December 2016 to April 2017, and the two-month period from November 2017 to January 2018. McMillen does not, however, present evidence sufficient to show that either of these "delays" were intentional; were so far afield of accepted professional standards as to raise the inference that the Doctors were not actually making medical judgments; or were so plainly inappropriate as to permit the inference that the Doctors intentionally or recklessly disregarded his needs. *Forbes,* 112 F.3d at 267; *Hayes*, 546 F.3d at 524.

McMillen offers no expert opinion as to the timeliness or adequacy of the treatment of his breathing and chest conditions. Instead, he relies exclusively on his

---

[2] McMillen argues there was another delay between January 16, 2018 and April 1, 2018, but his medical records belie that argument. (Dkt. 120 at 10.) On February 15, 2018, Dr. Elazegui treated McMillen and noted that the pulmonary and cardiology follow-ups recommended by Dr. Levin were approved. (Dkt. 84-6 at 210.) On February 25, 2018, an ECG revealed no changes and McMillen was advised to start taking his medications as ordered. (*Id*. at 212.) On March 3 and March 6, 2018, McMillen was treated for shortness of breath, and he was hospitalized on April 1, 2018 due to wheezing and breathing complications, including pneumonia. (Dkt. 84-6 at 215.) There was no delay during this period, and McMillen does not argue that the records are incorrect.

own subjective and lay medical opinions. That reliance fails: an inmate's subjective and lay opinion about what his medical treatment should have been is not sufficient to defeat summary judgment. In contradiction of McMillen's claims, Dr. Ronald Berger, a licensed medical physician in the State of Illinois and board certified in Cardiology and Internal Medicine, opined that McMillen's treating physicians at Stateville managed his condition appropriately and that a referral to a cardiologist was not medically necessary from 2013 to 2017. (Dkt. 120-1 ¶¶ 76–77.) Dr. Berger further opined that there was no "delay" in referring McMillen for offsite care, and that none of McMillen medical conditions were exacerbated or allowed to progress as a result of not being referred to a specialist sooner than he was. (*Id.* ¶ 77.) Dr. Berger opined that, when McMillen's complaints worsened in 2017, McMillen's physicians at Stateville acted promptly and appropriately by referring him to specialists when indicated. (*Id.* ¶ 79.)

Given Dr. Berger's opinion and McMillen's lack of evidentiary support, McMillen cannot establish that the Doctors acted with a sufficiently culpable state of mind to support his claim of deliberate indifference. Because McMillen cannot make a showing sufficient to establish the existence of an essential element of his claim, the Doctors are entitled to judgment in their favor as on Count II.

### 1.    December 2016 to April 2017

McMillan complains of the alleged "delay" between December 22, 2016, when he first reported his breathing/chest condition to Dr. Obaisi, and April 26, 2017, when McMillen was hospitalized on an emergency basis for hypertensive heart disease.

(Dkt. 120 ¶¶ 7–8.) As early as May 2013, McMillen took medication to reduce the risk of heart attacks. (Dkt. 120-1 ¶ 37.) At the December 22, 2016 appointment, McMillen was in "moderate distress" and reported being out of his inhaler and having difficulty breathing. (Dkt. 84-6 at 56.) McMillen's medical records do not reflect that he reported chest pain. (*Id.*) Dr. Obaisi prescribed daily nebulizer treatments to McMillen, who had a history of asthma, but McMillen did not comply with that course of treatment. (Dkt. 126 ¶ 15.) An ECG performed on February 25, 2017 revealed that his chest condition had not changed.[3] (Dkt. 84-6 at 56.) McMillen suggests that, from December 2016, his chest pain and difficulty breathing progressively worsened until his emergency hospitalization four months later on April 26, 2017. No medical records, however, corroborate this assertion. (Dkt. 120-2, Ex. 1 ¶ 14; Dkt. 126 ¶¶ 13–15.) At the emergency room, McMillen received a cardiac catheterization and an intra-aortic balloon pump and was transferred to UIC for two weeks of additional care and monitoring. (Dkt. 120-1 ¶ 47.) This is the first "delay" of which McMillen complains.

Other than the note allegedly from February 25, 2017, the parties provide no records between December 22, 2016 and April 26, 2017. As a result, the only evidence that McMillen was reporting worsening symptoms is his affidavit. To thwart a

---

[3] The parties and Dr. Berger suggest that McMillen was treated on February 25, 2017. (Dkt 120-1 ¶ 46; Dkt 84-5 at 4.) A review of McMillen's records reveals a note dated February 25, 2017, at 10:10 a.m. It appears that note was actually entered on February 25, 2018, as it is couched between two notes dated February 15, 2018 and February 25, 2018 at 10:20 a.m. and it notes a history of a heart attack which occurred in April of 2017. (Dkt. 84-6 at 210-212.)

summary judgment motion, an affidavit must be based on personal knowledge and set forth specific facts showing that there is a genuine issue for trial. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003); *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014) (the nonmoving party cannot rely upon the pleadings or speculation to show a genuine dispute as to a material fact). McMillen's affidavit does not set forth specific facts that he reported—and that Dr. Obaisi ignored—worsening symptoms. McMillen's affidavit is therefore insufficient to establish a dispute of material fact in this regard. Notably, nothing in McMillen's initial complaint filed on February 6, 2017, *i.e.*, in the middle of this alleged "delay," mentions his breathing/chest condition. Presumably, if McMillen's complaints of chest issues had been ignored at that time, he would have mentioned that in his complaint. Because McMillen's affidavit lacks specific facts as well as any verifying medical evidence, McMillen's affidavit is insufficient to raise a genuine issue of material fact. *Berry*, 604 F.3d at 441.

Even assuming he experienced and reported worsening conditions, McMillen still cannot make a showing sufficient to establish that the Doctors acted with a sufficiently culpable state of mind. *Celotex*, 477 U.S. at 322. McMillen offers no evidence that Dr. Obaisi had subjective knowledge of the risk posed by his breathing/chest condition or that he disregarded that risk. *Collins,* 462 F.3d at 761. If the ECG was performed on February 25, 2017, as the parties suggest, that test revealed that his breathing/chest condition was stable, demonstrating that Dr. Obaisi had no subjective knowledge of the risk posed by his breathing/chest condition. (Dkt.

84-6 at 56.) Moreover, McMillen was treated daily during this period, further demonstrating Dr. Obaisi's lack of subjective knowledge of the risk. (Dkt. 126 ¶ 12.) Dr. Berger's opinion that Dr. Obaisi managed McMillen's condition appropriately further supports this conclusion that Dr. Obaisi did not possess subjective knowledge of the risk posed by McMillen's breathing/chest condition or that he disregarded that risk. (Dkt. 120-1 ¶¶ 76–77.)

McMillen initially reported being out of his inhaler and having difficulties breathing. (Dkt. 84-6 at 56.) Considering McMillen's history of asthma, it was appropriate that Dr. Obaisi prescribed the daily nebulizer treatments in response to McMillen's complaints of difficulty breathing. (Dkt. 126 ¶ 15.) That course of treatment was not so far afield of accepted professional standards as to raise the inference that Dr. Obaisi was not actually making medical judgments. *Forbes*, 112 F.3d at 267. McMillen also offers no evidence he suffered prolonged and unnecessary pain during this time, only "moderate distress." (Dkt. 84-6 at 56.). No reasonable jury could infer from this "delay" that Dr. Obaisi intentionally or recklessly disregarded McMillen's needs.

### 2. November 2017 to January 2018

After his discharge from the emergency room, McMillen had numerous follow-ups with various doctors between May 4, 2017 and May 13, 2017 when Dr. Levin recommended discharge and physical therapy. (*Id.* ¶¶ 47–48.) On July 11, 2017, Dr. Levin adjusted McMillen's medications and administered an ECG. (*Id.* ¶ 49.) McMillen claims Dr. Levin also recommended that Mr. McMillen have a pulmonary

consult, but nothing in his medical records reflects that. (Dkt 120 at 9.) Dr. Levin did order a follow-up within four months (approximately November 11, 2017) and McMillen complains that he did not return to Dr. Levin until January 16, 2018. (Dkt. 126 ¶ 18-19.) This is the second "delay" of which McMillen complains. For similar reasons, this "delay" is also insufficient to infer that Dr. Obaisi intentionally or recklessly disregarded McMillen's needs.

To begin, there is no evidence this two-month delay was "significant" or that McMillen suffered prolonged or unnecessary pain during this time. *Berry*, 604 F.3d at 441. McMillen attended physical therapy from July 11, 2017 until August 8, 2017, when he reported feeling better and that he did not feel like exercising. (Dkt. 120-1 ¶ 50.) On December 3, 2017, at the direction of Dr. Obaisi and Wexford, McMillen had a chest x-ray completed, which revealed moderate cardiomegaly with clear lungs. (Dkt. 120-1 ¶ 51; Dkt 84-6 at 189.) When McMillen returned to Dr. Levin on January 16, 2018, Dr. Levin noted that "[McMillen's] clinical history and exam is not significant for worsening heart failure," and recommended a pulmonary consult to return in four months. (Dkt. 126 ¶¶ 18–19; Dkt. 84-6 at 127). McMillen's medical records do not show that McMillen was suffering from prolonged or unnecessary pain during this period; rather, the records show that he was feeling better, had clear lungs, and that his heart condition was stable.

Nothing about this two-month delay was so far afield of accepted professional standards or so plainly inappropriate as to raise the inference that the Doctors were not actually making medical judgments or that they intentionally or recklessly

disregarded McMillen's needs. Dr. Berger's opinion suggests just the opposite: the Doctors managed McMillen's condition promptly and appropriately when indicated. (Dkt. 120-1 ¶¶ 76–77, 79.) Consequently, no reasonable juror could infer from this "delay" that the Doctors acted with the culpability necessary to establish a claim for deliberate indifference.

## IV.    CONCLUSION

Under the Eighth Amendment, McMillen was entitled to demand neither specific care nor the best care possible. Rather, McMillen was entitled to reasonable measures to meet a substantial risk of serious harm. As the undisputed record shows, the Doctors performed those measures in a timely manner. McMillen has not established a genuine issue of material fact and has not put forth sufficient evidence to establish essential elements of his claims. Put another way, no reasonable juror could listen to the totality of the McMillen's medical treatment and conclude the Doctors acted with deliberate indifference in administering that care. Defendants' motion for summary judgment (Dkt. 82) is therefore granted.

SO ORDERED in No. 17-cv-00999.

Date: March 31, 2023

JOHN F. KNESS
United States District Judge